# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 17, 2010 Session

## JOEL KEENER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Warren County**
**No. F-9282      Larry B. Stanley, Judge**

---

**No. M2009-02489-CCA-R3-PC - Filed November 19, 2010**

---

The Petitioner, Joel Keener, appeals as of right the Warren County Circuit Court's denial of his petition for post-conviction relief. In 2005, the Petitioner was convicted by a jury of facilitation of manufacturing methamphetamine and sentenced to eight years in the Department of Correction. On appeal, he argues that the denial of his petition was error because he did not receive the effective assistance of counsel at trial. Specifically, he contends that counsel failed to seek severance of the charges, failed to seek suppression of the Petitioner's statement, and failed to challenge admission of a photograph showing iodine-stained hands. He argues that the cumulative effect of these errors denied him a fair trial. Following our review of the record and the parties' briefs, we conclude that the Petitioner has not shown that he is entitled to relief. The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

John E. Nicoll, Manchester, Tennessee, for the appellant, Joel Keener.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; and Lisa Zavogiannis, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The Petitioner was initially charged with manufacture of methamphetamine and unlawful possession of a weapon. After a trial by jury, he was convicted of the lesser-included offense of facilitation of manufacture of methamphetamine and acquitted of the weapon charge. He was subsequently sentenced as a Range II, multiple offender to eight years in the Department of Correction. On direct appeal, this Court affirmed the sufficiency of the convicting evidence supporting the Petitioner's conviction and upheld the sentence as imposed. See State v. Joel Keener, No. M2005-01923-CCA-R3-CD, 2006 WL 1931805 (Tenn. Crim. App., Nashville, July 13, 2006), perm. to appeal denied, (Tenn., Dec. 27, 2006).

In this Court's opinion adjudicating the Petitioner's direct appeal, this Court detailed the relevant proceedings as follows:

> At the [Petitioner's] trial on these charges, the following evidence was presented: Tony Jenkins, a detective with the McMinnville Police Department, testified that, on October 25, 2002, he and another detective, Mike Vann, went to 115 Morningside Drive to get the contents of the trash can. He said that he and Detective Vann took the contents to another location to search for mail and discarded items used in the manufacture of methamphetamine. Detective Jenkins agreed that, based on what they found and other observations made at this address, he obtained a search warrant for the address on October 28, 2002.
>
> Detective Jenkins testified that he participated in the execution of the search warrant on October 29, 2002. When they got to the house a woman named Deana Tate, who lived in the home, answered the door. The detective entered the home and saw the [Petitioner] moving around under the bedcovers. Detective Jenkins ordered the [Petitioner] to show his hands, but the [Petitioner] would not show his hands. The detective pulled the bedcovers off of the [Petitioner] and took him into custody.
>
> On cross-examination, the detective agreed that he did not recall finding any tubing or coffee filters at the house. He also did not find any Ephedrine or Pseudoephedrine pills. The detective was unsure whether several other items that he was asked about were found in the home, and he agreed that some of these items were common items to be found around a methamphetamine laboratory. The detective said that he did not find any bills or receipts from chemical companies or any unused baggies. The detective conceded that he did not find any methamphetamine residue, large quantities

-2-

of cash, or any cutting agents.  Detective Jenkins also conceded that he did not know whether the [Petitioner] was at the house on the night that the detective searched the trash.  The detective had, however, seen the [Petitioner] at this residence once or twice prior to the date that the search warrant was executed.  Detective Jenkins did not find anything in the trash can listing the [Petitioner]'s name.

Detective Jenkins said that he found a handgun in the same room as the [Petitioner], but it was not on the [Petitioner]'s person.  He said that he did not fingerprint the handgun to see if the [Petitioner] had ever handled the gun.  Therefore, he agreed that he could not say for sure whether the [Petitioner] touched the gun.  The detective agreed that Deana Marie Tate claimed that the handgun belonged to her deceased ex-husband, and he said that the gun was located between the wall and the bed, which was within the [Petitioner]'s reach.

The detective said that he found no consumable or marketable methamphetamine at the residence.  He testified that no methamphetamine could have been produced from what he found at the residence when he executed the search warrant.  Detective Jenkins did find red phosphorus in the [Petitioner]'s pant's pocket.   The detective said that he arrested the [Petitioner], and he agreed that he was "up close" with the [Petitioner].  He testified that he did not see any sores on the [Petitioner]'s hands, but he did see iodine stains on them.  The detective agreed that he did not recall finding any drug paraphernalia, pipes, rolling papers, or needles on the [Petitioner].  Detective Jenkins testified that there was no proof that the red phosphorus in the [Petitioner]'s possession was processed at the house where the search warrant was executed.  Further, the detective agreed that there was not an odor of "fresh cooked methamphetamine" at the house, but his eyes and throat did burn while he was at the home as if methamphetamine had been cooked there in the last few days.

On redirect examination, Detective Jenkins testified that of the sixty to seventy methamphetamine labs that he has discovered while in law enforcement he found large sums of money at only two of them.  Further, he said that, based on his training and experience, the substance found in the [Petitioner]'s pocket was red phosphorus and that red phosphorus is one of the ingredients used to manufacture methamphetamine. Detective Jenkins testified that he thought that methamphetamine had been manufactured in the residence

somewhere between October 25th and 29th, before the search warrant was executed.

Mike Vann, a detective with the McMinnville Police Department, testified as an expert in the area of investigation of clandestine methamphetamine laboratories that he was involved in the investigation of this case. He said that he assisted Detective Jenkins in a "trash pull" on October 25, 2002, to look for evidence of illegal drug activity. In the trash, the detective found empty chemical containers, old filters, and other items that led him to believe that something illegal was occurring in the house. Detective Vann said that, based on the evidence found in the trash, Detective Jenkins obtained, and they both executed, a search warrant of the home. The detective said that when he investigates methamphetamine laboratories he looks for ephedrine or pseudoephedrine, iodine or iodine crystals, and red phosphorus. The detective said that obtaining the red phosphorus from matchbooks is labor intensive, but it is a key ingredient in the manufacture of methamphetamine. Detective Vann listed multiple other ingredients used in the manufacture of methamphetamine and said that he does not always find all of these at every methamphetamine laboratory that he discovers. He said that, sometimes, they arrive after the methamphetamine has been produced so you only find some, and not all, of the necessary ingredients.

The detective identified multiple pictures of the home, including one that depicted a handgun that was found underneath the bed lying against the wall. He agreed that this gun was found underneath the bed in the bedroom where the [Petitioner] was when they executed the search warrant. Detective Vann indicated that the [Petitioner] could have leaned over the side of the bed and been able to reach the gun. Also in that room, the detective found a jar wrapped in tape that contained iodine crystals, a "true laboratory flask," a set of scales, a propane torch, two baggies, a small plastic white translucent looking container, a blister pack that is commonly used to package cold medicines, and a propane camp stove. The detective said that all of these items were significant in that they could be used in the manufacture of methamphetamine.

Detective Vann testified about the items that he found in the trash on October 29, 2002, the day the search warrant was executed. He said that he found what he would consider "meth trash," which included empty blister packs of over-the-counter cold medicine, charcoal lighter fluid, empty containers, Heet gas treatment, which contains methyl alcohol that is used to

-4-

separate the pills, and several filters. Additionally, he found an HCL generator, which is commonly used in the manufacture of methamphetamine. In a city trash can, the detective found coffee filters that contained red phosphorus, coke bottles that had been cut off as if to be used as funnels, an empty box of Sudafed, and tubing. Detective Vann also found a glass tube similar to those used commonly to ingest methamphetamine. The detective also identified a photograph depicting the iodine stains on the [Petitioner]'s hands. He said that, commonly, he looks for iodine stains on a person's hands that he suspects of manufacturing methamphetamine.

On cross-examination, the detective agreed that he did not see the [Petitioner] on October 25, 2002, the day that they did the "trash pull," and he did not find any evidence that day that would link the [Petitioner] to a methamphetamine laboratory. Detective Vann testified that on the day that he executed the search warrant he did not find any matches, lye, or brake cleaner, and he did not find any ephedrine or pseudoephedrine, acid, tubing, or aluminum foil inside the home. He also did not find evidence that the [Petitioner] processed the red phosphorus that was in his possession. The detective conceded that methamphetamine could not be made from iodine crystals, red phosphorous, and Coleman fuel alone. Detective Vann testified that he did not take fingerprints from the glass flasks or the handgun found in the room with the [Petitioner]. The detective testified that he did not find any methamphetamine at the house, and he agreed that there was nothing wrong with owning some of the items that he found in the house. The detective agreed that the trash can did not have a lock on it and that it was possible that someone else put the trash in the trash can. He agreed that a person would have to have lye in order to produce methamphetamine. Detective Vann testified that he noticed the odor of methamphetamine when he entered the house, but the odor was not strong. He agreed that he also did not find any cutting agents, large amounts of cash, or any records or ledger books relating to the illegal distribution of methamphetamine.

Jason Rowland, an investigator employed with the District Attorney's Office and the Drug Task Force, testified that he participated in the execution of this search warrant. Shortly after the warrant was executed, he and another detective went back to Rowland's office to interview the [Petitioner]. Rowland said that he read the [Petitioner] his rights, and the [Petitioner] waived those rights. Rowland then identified a videotaped interview with the [Petitioner], and it was played for the jury.

In the interview, much of which was unintelligible, the [Petitioner] said that he had stayed at the home that was searched "off and on" for two or three months and that he and Tate sometimes dated. The [Petitioner] said that he tried to keep the home clean and so he had cleaned out mason jars and picked up coffee filters, but he did not know how they had been used. He said that he knew the ingredients for cooking methamphetamine, but he did not know that anyone was cooking it in the house. The [Petitioner] said that he did not know that there was anything in his pockets and that someone must have planted this evidence on him. He said that he had bought iodine for a person three or four weeks ago, but he refused to say whom he bought the iodine for because that person had traded the iodine for drugs. The [Petitioner] denied knowing that there was a gun in the room in which he was found, saying that he had just pulled back the covers and gone to sleep in the room but had never looked around. He denied that the stains on his hands were from iodine and explained that he thought they were grease stains from working on Tate's car. The [Petitioner] then admitted that, one time, a man named "Charles" came to the house and cooked methamphetamine, and he thought that maybe it was two or three days ago. He admitted that he went to Target and other stores near Murfreesboro to purchase chemicals that were needed for the cooking process. He said that he did not stay in the room when "they" cooked methamphetamine and that "they" brought him some methamphetamine after "they" finished cooking.

On cross-examination, Rowland said that it was not illegal to purchase iodine, matches, or cold pills. He said that the [Petitioner] told him that he took a "quarter," presumably of a gram, of methamphetamine per week, and Rowland agreed that a quarter is a small amount.

The parties stipulated that the [Petitioner] had a prior felony drug conviction.

Deana Marie Tate testified that she lived at the house that was searched by police, and she had picked up the [Petitioner] at his mother's house during the evening prior to the search. Tate said that, at the time, the [Petitioner] lived with his mother and not with her. She said that he stayed at her house approximately four or five nights per week at the most, and she had known him for about one month. Tate said that the [Petitioner] was a "real druggy" at this time and that he smoked a lot of pot. She said that when she went to get the [Petitioner] he was "groggy," and as soon as they got to her house he went to sleep. Tate said that she left the house and did not return until somewhere

-6-

between 11:00 p.m. and 1:00 a.m. She checked on the [Petitioner], and he was still asleep. Tate testified that she did not tell the [Petitioner] that there was a methamphetamine laboratory in her home, and there was not an agreement between the [Petitioner] and her to manufacture methamphetamine. Tate said that the [Petitioner] never bought pills or iodine, but Tate did, and the [Petitioner] had no idea what was happening. Tate testified that she "guess[ed]" that the two guns that were at the house belonged to her. Tate identified the photograph previously entered of some iodine stains on hands. She said that the hands depicted in that photograph were hers and that she had iodine stains and burns on her hands.

On cross-examination, Tate testified that, at the time of this incident, she was using methamphetamine fairly heavily. She indicated that, therefore, her memory of this particular time was incomplete. Tate said that she put the gun underneath the bed in the room where the [Petitioner] was sleeping after her husband was killed. She testified that the last time that she manufactured methamphetamine in her home was approximately two weeks prior to the search. She agreed that she would make some of the methamphetamine at her house and then take it somewhere else to finish the cooking process.

On redirect examination, Tate agreed that she pled guilty to owning all of the items found by police. She said that everything in the house was hers and not the [Petitioner]'s. Further, the [Petitioner] never helped her make methamphetamine.

Id. at *1-5. Based upon this evidence, the Petitioner was convicted of the facilitation of the manufacture of methamphetamine, a Class D felony. Id. at 5. The trial court sentenced the Petitioner to eight years in the Department of Correction. Id. at *6.

Thereafter, the Petitioner filed a petition for post-conviction relief.[1] Counsel was appointed for the Petitioner, and an amended petition was filed on July 22, 2008. The Petitioner asserted he did not receive the effective assistance of counsel at trial. As specific grounds for relief, the Petitioner made the following allegations: (1) trial counsel was ineffective for failing to move to sever the weapon charge from the drug charge; (2) trial counsel was ineffective for failing to seek suppression of the Petitioner's videotaped

---

[1] A copy of this petition is not included in the record on appeal. Therefore, we do not know if it was timely filed. However, the State, in its response to the petitions, admitted that the original petition was timely filed.

statement, which statement was made in violation of his <u>Miranda</u> rights, contained evidence of uncharged misconduct, and was of poor audio quality; (3) trial counsel was ineffective for failing to challenge admission of the photograph showing iodine-stained hands; (4) trial counsel was ineffective for failing to meet with the Petitioner often enough, failing to properly investigate the case, and failing to adequately prepare for trial, sentencing, or the motion for new trial hearing; and (5) trial counsel was ineffective in his representation of the Petitioner at the sentencing hearing and at the motion for new trial hearing, failing to argue mitigating factors at the sentencing hearing and failing to raise potential legal issues in the motion for new trial.

A hearing was held January 14, 2009. Deana Marie Tate Taylor was first to testify. She stated that, prior to the Petitioner's trial, she met with trial counsel once in person for "a few minutes at his office" and once by telephone speaking with him for "five or ten minutes maybe." Ms. Taylor confirmed that she testified at the Petitioner's trial that he did not have any part in the manufacturing process. Ms. Taylor was shown the photograph of the iodine-stained hands entered as evidence against the Petitioner at trial; she stated that the hands in the photo belonged to her and that the photograph was taken at the Warren County Jail. She discussed identifying marks of the hands to illustrate that the hands were in fact hers. Ms. Taylor did not believe she saw the photograph before the Petitioner's trial; however, she admitted that she was able to tell the jury, upon questioning by trial counsel, that those were a picture of her hands. She further relayed in front of the jury that the gun found under the bed the Petitioner was sleeping on belonged to her. Ms. Taylor could not explain the red phosphorus found in the Petitioner's pockets.

The Petitioner then testified that he only met with trial counsel three or four times prior to trial. The Petitioner claimed that trial counsel did not review any evidence with him prior to trial and that he was never shown his videotaped statement or a picture of the iodine-stained hands. On the day of trial, when the Petitioner first saw the picture, he notified trial counsel that the hands in the photograph were not his. According to the Petitioner, trial counsel never discussed trial strategy with him, instead only telling the Petitioner "what he was going to do." The Petitioner asserted that, prior to trial, he had filed a motion to have trial counsel removed as his attorney.

The Petitioner stated that he told trial counsel he was concerned about "uncharged misconduct" on the videotape coming before the jury. The Petitioner admitted that, during the interview, he told officers that he had gone to Murfreesboro and purchased some items to manufacture methamphetamine. The Petitioner challenged the following statements on the videotape, contending that they were "uncharged misconduct": (1) "Why am I always getting caught up in this stuff?"; (2) "I'm on probation."; (3) "I use the shit."; (4) "I traded some iodine with some guy named Bubba several weeks ago."; (5) "Why am I always getting

caught up in these meth labs?'; and (6) "How much dope are you doing?," to which the Petitioner responded, "Maybe a quarter per week."

When asked about the red phosphorous found in his pockets, the Petitioner stated that he knew something was in his pocket but was not sure what it was. The forty-two-year old Petitioner admitted that he had a significant history of criminal convictions beginning at the age of nineteen. He confirmed that he had prior felony convictions, including one for attempted manufacture of methamphetamine.

Trial counsel then testified. He recalled talking with the Petitioner and discussing trial strategy. He stated that he reviewed the evidence in the Petitioner's case and was aware of the Petitioner's extensive criminal record.

When asked if he spoke with Ms. Taylor prior to the Petitioner's trial, trial counsel replied affirmatively and relayed that he knew she would assert at trial that the hands in the photo were hers and claim ownership of the gun found under the bed. Trial counsel asserted that it was his trial strategy to allow Officer Mike Vann to identify the hands in the photograph as the Petitioner's and, thereafter, have Ms. Taylor discredit that claim, alerting the jury that if the officers "misrepresented that they might have misrepresented something else."

Trial counsel also testified that it was trial strategy to allow the entire videotape to be played in front of the jury:

> It was better in my thinking to have that video played and let the [j]ury hear what was on it or not hear than to have [the district attorney's investigator] give his spin on it. And there were parts in there where [the Petitioner], what I thought that would help [the Petitioner] in that he was trying to aide [sic] the police in finding whoever was buying or selling or whatever.

Trial counsel further relayed that the he believed the Petitioner's statements of denial on the tape would be helpful.

When asked why he did not seek to sever the weapon charge from the drug charge, trial counsel responded again that it was trial strategy and that he knew Ms. Taylor would testify that the gun belonged to her. He explained, "in my opinion, if we severed the two trials, then if we have a trial about the gun, the police just can't magically appear and it was going to come in that they were there for drugs." Trial counsel confirmed that he stipulated the Petitioner had a prior felony drug conviction. It was noted that the jury acquitted the

Petitioner of the weapon offense and found him guilty of a lesser-included offense of the indicted drug charge.

Regarding sentencing, trial counsel testified that he filed a notice of mitigating factors with the trial court, but he could not recall specifically what those factors were. Trial counsel could not remember why he did not any argue mitigating factors to the trial court at the sentencing hearing. However, he normally reviewed pre-sentence reports with his clients prior to sentencing. It was noted that an erroneous statement was made at the motion for new trial hearing: the prosecutor stated that the Petitioner was sentenced in the middle of his range, when in fact, he was sentenced at the top of his range. The trial court then stated it was affirming the "mid-range" sentence.

After reviewing the evidence presented, the post-conviction court denied relief by written order. This appeal followed.

**Analysis**

**I. Notice of Appeal**

First, the State argues that we should dismiss the appeal because the Petitioner's notice of appeal document was not timely filed. An order was entered on February 17, 2009, wherein the post-conviction court summarized its findings of fact and conclusions of law at the post-conviction hearing. The order was prepared by the district attorney general and signed by the post-conviction judge. In the order, the judge ordered a resentencing hearing for February 25, 2009, to allow the Petitioner to present mitigating factors that were not argued or presented at his original sentencing hearing. All of the other claims were denied.

After correspondence between both attorneys, defense counsel did not approve of the "proposed order" and filed a motion for formal written findings of fact and conclusions of law on February 24, 2009. According to an affidavit of post-conviction counsel, at this time, neither lawyer had any knowledge of entry of the February 17, 2009 order. A transcript was thereafter prepared upon the agreement of all parties. An "Agreed Notice of Hearing" was filed on August 14, 2009, setting the case for a hearing on September 23, 2009, in order "to complete the final order regarding the post-conviction hearing that was conducted in this matter on January 14, 2009." Another "final" order on the Petitioner's petition was filed on November 4, 2009; the ultimate conclusions in this order do not differ or change the rulings made in the February 17, 2009. The notice of appeal document was then filed on December 3, 2009.

While the State correctly notes that the post-conviction court had no authority to alter the judgment once it became final, the notice of appeal document is not jurisdictional. See

Tenn. R. App. 4(a). Because it appears form the record that there was justifiable excuse for the delay, we will waive the timely filing of such document in the interest of justice.

## II. Ineffective Assistance of Counsel

The Petitioner argues that trial counsel rendered ineffective assistance, thus violating his right to competent representation as guaranteed by the Sixth Amendment to the United States Constitution. In this appeal, he specifically argues that counsel failed to pursue severance of the charges to the Petitioner's prejudice, failed to adequately handle the Petitioner's videotaped statement, and failed to seek suppression of the photograph showing the iodine-stained hands resulting in prejudice to the Petitioner. Finally, he argues that the cumulative effect of these errors require reversal of his conviction.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer and actual prejudice to the defense caused by the deficient performance. Id. at 687; Burns, 6 S.W.3d at 461. To demonstrate prejudice, a defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The defendant bears the burden of establishing both of these components by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics,

see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. Id. "However, a trial court's conclusions of law—such as whether counsel's performance was deficient or whether that deficiency was prejudicial—are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id. (emphasis in original).

## A. Severance of the Charges

The Petitioner complains that the post-conviction court erred by determining that trial counsel's failure to sever the charges did not result in prejudice to him. He submits that, if the charges had been severed, the jury would not have heard about the prior conviction during the Petitioner's trial on the drug charge and that this information prejudiced his defense. The Petitioner points to the fact that his prior felony drug conviction was referred to five times during his trial.

The post-conviction court ruled that trial counsel was deficient in not seeking severance of the charges "because the evidence regarding the [Petitioner]'s prior felony drug offense would not have had any relevance at the trial if not for the gun charge being tried with it." The court then determined that, if a motion to sever had been made, it would have granted said motion. The post-conviction court then went on to address any potential prejudice to the Petitioner, concluding as follows:

[A]lthough the evidence of the [Petitioner's] prior felony drug conviction was harmful to the [Petitioner], it did not rise to the level of undermining the judgment of the jury based on the totality of the circumstances. This court finds that the crux of the government's case was the objects found on the [Petitioner]'s possession or in the room he occupied, and the statements he made regarding buying pills and using methamphetamine. As such, this court finds that the [Petitioner] has failed to meet his burden of demonstrating a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

Immediately following the stipulation that the Petitioner had a prior felony drug conviction, the trial court gave the following instruction:

All right. Ladies and gentleman, a stipulation is an agreement by the parties that a certain fact or set of facts does exist. In this case, the parties, both of the attorneys, have agreed that certain facts do exist, and you can accept that as having been testified to without hearing any evidence. That fact was that the defendant has a prior felony drug conviction. That is part of the requirement in Count 2 of the unlawful possession of a weapon. You will recall me reading the definition of that offense. That is something that can be considered in that particular offense. They have agreed that that fact does exist.

A jury is presumed to follow the instructions of the court. See State v. Banks, 271 S.W.3d 90, 134 (Tenn. 2008). Although not a specific instruction addressing character evidence, this instruction did mitigate the harmful effect that introduction of the prior conviction may have had upon the jury, lessening the possibility that the jury considered the prior conviction as evidence of the Petitioner's propensity to commit the underlying offense.

Most importantly, as noted by the post-conviction court the "crux of the government's case" was the red phosphorous found in the Petitioner's pant's pocket, the iodine stains on the Petitioner's hands, the items found in the room he occupied when officers searched the residence, and the statements he made regarding buying pills and using methamphetamine. We agree with the post-conviction court that the Petitioner has failed to demonstrate prejudice.

## B. Videotaped Statement

Next, the Petitioner argues that trial counsel was ineffective for failing to seek suppression of his videotaped police interview or, in the alternative, failing to have the videotape redacted. Specifically, he makes two challenges to the videotaped statement: (1) the audio of the tape was of "such bad quality that it could not be heard clearly by the jury," forcing them to instead rely on the statements of the prosecutor and trial counsel; and (2) the tape contained evidence of "uncharged misconduct" which was improper character evidence.

The post-conviction court again determined that trial counsel was ineffective but found no prejudice. The post-conviction court found that "the content of the tape for the most part was not beneficial to the [Petitioner]" and, therefore, agreed with the Petitioner that it was not proper strategy "to allow the videotape to be played for the jury without some attempt to mitigate the incriminating or prejudicial statements contained thereon."

Regarding the allegation that the trial counsel should have sought to have the tape excluded because it contained "uncharged misconduct," the post-conviction court concurred that some of the statements made by the Petitioner during the interview ("being on probation"

and "always getting caught up in these things") were uncharged misconduct. However, the court then went on to find "that most of the statements made by the [Petitioner] on the videotape such as 'he bought pills on occasion' and 'that he used methamphetamine on occasion' are not 'uncharged misconduct' as the [Petitioner] claims, but instead are probative evidence of the [Petitioner's] guilt in the facilitation of manufacturing process." In conclusion, the court ruled that the statements of "uncharged misconduct" that were admitted into evidence were not prejudicial to the Petitioner.

Next, the post-conviction court addressed the Petitioner's argument that the videotape should have been excluded or some other action taken due to the tape's poor audio quality. The court concluded that the jury was "in the best position to make its own determination of what was heard. The jury can give said evidence the weight it deserves or does not deserve based on the totality of the circumstances, including the audibleness of the recording."

The post-conviction court stated that, even if counsel had filed a motion to suppress or redact the recording, the court would only have redacted a small portion of the recording as the videotape established proof of the necessary elements of the offense—furnishing substantial assistance in the manufacturing process. We again concur with the post-conviction court that the Petitioner failed to demonstrate prejudice. While the audio portion of the tape may have been of poor quality, the entire tape was played for the jury. The jury was instructed that the statements, arguments, and remarks of counsel "are not evidence," and the jury was presumed to follow these instructions. See Banks, 271 S.W.3d at 134. It was for the jury to assess the weight and credibility of the videotaped interview. The Petitioner is not entitled to relief on this issue.

### C. Photograph of Hands

The Petitioner contends that trial counsel's decision not to challenge the photograph of the iodine-stained hands was based on inadequate preparation. He submits that trial counsel, knowing the hands did not belong to the Petitioner, should have filed a motion in limine to suppress the photograph or, at the very least, objected to the introduction of said photograph at trial.

At the post-conviction hearing, trial counsel testified that he interviewed Ms. Taylor and knew prior to trial that the photograph was of her hands. The post-conviction court accredited this statement of trial counsel. In addition, trial counsel stated that he made a strategic decision not to challenge the photograph at any point and allow Officer Vann to testify at length about the photograph. When Ms. Taylor rebutted Officer Vann's testimony, he thought that it would call the officer's credibility into question and that the jury might believe that the officers may have misrepresented something else. The post-conviction court determined that trial counsel's decision was sound strategy. The court found that trial

counsel was aware before trial that "the hands depicted in the photograph were not those of [the Petitioner]"; however, trial counsel chose not to raise the issue in a pretrial motion "because he wanted to surprise the government counsel at trial." This Court may not second-guess a reasonably-based trial strategy based upon adequate preparation. The Petitioner is not entitled to relief on this issue.

**D. Cumulative Effect**

Finally, the Petitioner asserts that the cumulative effect of these errors denied him of his right to a fair trial. Under this theory, the Petitioner asserts that the aggregate total of counsel's errors did amount to prejudice when taken as a whole. After consideration of the entire record, we conclude that the cumulative effect of those individual errors did not deprive the Petitioner of a fair trial, as there was not a reasonable probability that the outcome of the Petitioner's case was effected.

## Conclusion

Based upon the foregoing reasoning and authorities, we conclude that the Petitioner has not shown he is entitled to relief on grounds of ineffective assistance of counsel. The judgment of Warren County Circuit Court denying post-conviction relief is affirmed.

_____
DAVID H. WELLES, JUDGE